UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

"IN ADMIRALTY"

| | |
|---|---|
| **M & F Fishing, Inc.**, a Nevada corporation,<br>Plaintiff,<br>vs.<br>**American Eagle Fishing LLC**, a Florida limited liability company, *in personam*; **Tradition Mariner, LLC** aka Tradition Mariner LLC, a Delaware limited liability company, *in personam*; and **Does 1-20**.<br>Defendants. | Case No. |

**COMPLAINT**

This is an action by Plaintiff M & F Fishing, Inc. ("**M & F Fishing**") for property damage and consequential economic harm arising from a June 17, 2019 collision on the High Seas caused by the *American Eagle*, a U.S. flag purse seiner ("*American Eagle*") owned and/or controlled by Defendants American Eagle Fishing LLC ("**AE Fishing**") and Tradition Mariner, LLC aka Tradition Mariner LLC ("**Tradition Mariner**") (collectively, "**Defendants**"). M & F Fishing seeks damages under the General Maritime Law of the United States on the basis that the collision and resulting damage were proximately caused by tortious conduct committed by Defendants, jointly and severally, in violation of legal duties imposed by the International Regulations for Preventing Collisions at Sea, 33 U.S.C. § 1602 ("**Navigation Rules**"), and generally accepted maritime standards, customs, and practices.

In support of this Complaint, M & F Fishing alleges:

## I. PARTIES

1. M & F Fishing is and at all relevant times was a corporation organized under the laws of Nevada, with its principal place of business at 5663 Balboa Ave. # 461, San Diego, California 92111-2705.

2. M & F Fishing is and at all relevant times was the owner and manager of the F/V *Koorale* ("***Koorale***"), a U.S. flag tuna purse seiner, U.S. Coast Guard ("**USCG**") official number 545564, 182.10 feet in length and weighing 1,072 gross tons.

3. The *Koorale*'s USCG documented hailing port is and at all relevant times was the port of Long Beach, California, and the *Koorale* has for approximately 36 years regularly sailed on commercial fishing voyages to and from the port of Pago Pago, American Samoa.

4. AE Fishing is and at all relevant times was a limited liability company organized under the laws of Florida with its principal place of business at 111 S. Armenia Ave., Ste. 101, Tampa, Florida 33609.

5. AE Fishing has and at all relevant times had an ownership interest in the *American Eagle* and/or managed, operated, maintained, controlled, and/or navigated the *American Eagle*. The *American Eagle* is and at all relevant times was a U.S. flag tuna purse seiner, USCG official number 1206090, 258.40 feet in length and weighing 2,310 gross tons.

6. The *American Eagle*'s USCG documented hailing port is and at all relevant times was the port of Pago Pago, American Samoa, and the *American Eagle* regularly and primarily sails, and at all relevant times sailed, on voyages to and from the port of Pago Pago, American Samoa.

7. Tradition Mariner is and at all relevant times was a limited liability company organized under the laws of Delaware with its principal place of business at 111 S. Armenia Ave., Ste. 101, Tampa, Florida 33609.

8. Tradition Mariner has and at all relevant times had an ownership interest in the *American Eagle*, through its ownership interest in AE Fishing, and/or managed, operated, maintained, controlled, and/or navigated the *American Eagle*.

9. The *American Eagle* is owned, managed, operated, navigated, and/or controlled by AE Fishing and Tradition Mariner.

10. On information and belief, Tradition Mariner also owns, manages, operates, controls, and/or navigates, either directly or through other Florida-based subsidiaries, other fishing vessels that frequently and primarily undertake voyages to and from Pago Pago Harbor, including the *American Victory*, *American Triumph*, *Evelina DaRosa*, and *Danielle Lynn* (the "**Tradition Mariner Fleet**").

11. Does 1 through 20 are currently unknown persons and/or entities that owned, managed, operated, maintained, controlled, and/or navigated the *American Eagle* and, as such, may be named at a later point in time when identified through discovery or otherwise.

## II. JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over this action in accordance with 28 U.S.C. § 1332(a). Complete diversity exists between M & F Fishing, which is incorporated in Nevada and headquartered in California, and Defendants, each of which is a domiciliary of Florida.

13. This Court also has subject matter jurisdiction over this action pursuant to Article III, Section 2, Clause 1 of the United States Constitution. This action is a claim under the General Maritime Law of the United States and the Navigation Rules and is an admiralty and maritime claim within the provisions of Federal Rules of Civil Procedure 9(h).

14. Venue is proper within this District pursuant to 28 U.S.C. § 1391, as this District is a judicial district where Defendants reside and are subject to personal jurisdiction.

15. This Court has personal jurisdiction over each of the Defendants because each is domiciled in the District.

### III. GENERAL ALLEGATIONS

16. At or about 1700 on June 17, 2019, the *Koorale* and the *American Eagle* were separately engaged in commercial fishing voyages (originating from Pago Pago Harbor, American Samoa) on the High Seas in the Eastern Tropical Pacific ("**ETP**"), approximately 1,525 miles northeast of American Samoa, when the *American Eagle* struck the *Koorale*'s port side bow quarter at full or near full speed, causing the *Koorale* severe damage (the "**Collision**").

17. As of the day of the Collision, the *Koorale* had been at sea fishing in the ETP for approximately 18 days and had been reasonably successful in her catch to that date, having caught approximately 400 metric tons.

18. The *Koorale* was fully manned with an experienced crew of 18, plus a NOAA Fisheries Observer, and the crew was on regular shifts of work/rest. The vessel was operating normally and was properly secured. Both the Master and Mate on the voyage were duly licensed to navigate the vessel.

19. Weather conditions on the day of the Collision were normal. The water was slightly rough with small swells of about two to three feet and an occasional four-foot swell. The wind was approximately 15 knots south, southeast.

20. Visibility was good, and the Mastman could see approximately 9-10 miles from the topmast. The *Koorale* crew could see numerous other fishing vessels in the vicinity, including the *American Eagle, American Victory, Sandra C, Cape Ferrat, Cape Finisterre,* and *Cape Breton*.

21. Approximately half an hour before the Collision, the *Koorale* was cruising on an easterly course when she spotted a school of fish approximately two miles off her starboard side.

22. The *Koorale* turned to starboard towards the school and headed directly for it at full speed on a south, southeast heading.

23. The Mastman was serving as visual lookout on the mast, reporting by radio to the Master and Mate, who were navigating and monitoring the radar in the wheelhouse. The remaining crew were readying for a set.

24. At about the same time, the *Koorale* crew could see the *American Eagle* approximately 10-20 degrees off the *Koorale*'s port side and about 6-7 miles from the school of fish. The *American Eagle*'s helicopter was airborne about three miles on the far side of the *American Eagle* from the *Koorale*'s perspective.

25. The *American Eagle* took a hard port turn in the direction of the *Koorale* and began moving at full or near full speed directly towards the *Koorale* on a west, southwest heading. *Koorale* crew members could see smoke rise from the *American Eagle*'s stack as she accelerated.

26. The *Koorale* continued towards the school, sailing on a nearly straight, southeast heading.

27. Because the *American Eagle* was significantly farther away from the school than the *Koorale* and relatively distant from the *Koorale*, the *Koorale* crew did not consider the *American Eagle* a threat and believed she would come up behind the *Koorale* as required by the Navigation Rules and the customs and practices of the Group Code, which provides that the closest vessel to the school has priority to attempt a set.

28. As the *Koorale* neared the school, the crew were ordered to stand by to set on the fish, which were by that time about a mile off of the *Koorale's* bow and visible to the naked eye.

29. However, as the *Koorale* further approached, the fish dropped below the surface of the water, so the *Koorale* positioned to wait for the "foamer"—i.e., for the school of fish to rise to the surface of the water.

30. The *Koorale* slowed to approximately 6-8 knots and dropped the sonar to better track the school. By this time, the fish were about half a mile off of the *Koorale's* bow.

31. At the same time, the *American Eagle* was about three miles off the *Koorale's* port side, still sailing towards the *Koorale* at full or near full speed on a west, southwest course. From the *American Eagle's* trajectory, it appeared to the *Koorale's* Mate, Master, and Mastman that the *American Eagle* would pass the *Koorale* on her stern, as expected per the Navigation Rules and the Group Code.

32. The *Koorale* drew nearer the school, which was then about 150-200 meters off the *Koorale's* starboard bow, at which point the *Koorale* crew observed that: (a) the *American Eagle's* helicopter had come in from the *Koorale's* port side and was hovering above the school that the *Koorale* was preparing to set upon; and (b) the *American Eagle* had changed course slightly to port and was on a southwest heading sailing directly toward the *Koorale's* midship, still moving at full or near full speed and about a mile and a half away.

33. As the *American Eagle* continued to approach at an approximately 90-degree angle off *Koorale's* port side, the *Koorale* crew became concerned that the *American Eagle* posed a collision risk but still believed that she would ultimately pass on the *Koorale's* stern as required by the Navigation Rules and Group Code. Given the conditions, the *American Eagle's* close proximity, and the location of the *American Eagle's* helicopter, the *Koorale* crew had no doubt the *American Eagle* could see the *Koorale* clearly.

34. Notwithstanding, the *American Eagle* maintained speed and direct course with the *Koorale*'s midship as she drew nearer, ultimately forcing the *Koorale* crew to take evasive action by pulling the vessel out of gear and into full reverse and turning hard to starboard.

35. Had the *Koorale* not taken such evasive action, the *American Eagle* likely would have struck a catastrophic and deadly blow to the *Koorale*'s midship, which likely would have sunk her or caused an ammonia or fuel leak given the location of the fish wells and fuel tanks.

36. Instead, due to *Koorale*'s evasive action, the *American Eagle* struck the *Koorale*'s port side bow quarter at full or near full speed.

37. While *Koorale*'s evasive action likely preserved lives and her seaworthiness, the *American Eagle*'s blow caused severe damage to the *Koorale*'s hull, machinery, equipment, and supplies.

38. On information and belief, the *American Eagle* took no evasive action to avoid the Collision.

39. The force of the Collision brought the vessels briefly parallel with each other, with the *American Eagle*'s starboard side to *Koorale*'s port side, before the *American Eagle* moved forward and the *Koorale* began moving in reverse because the *Koorale*'s engine was still in reverse from her evasive action.

40. After it became apparent that the *Koorale* was not sinking, the Master met with the crew at the muster station to reassure the crew.

41. The *Koorale* crew contacted the *Koorale*'s owner and the USCG to report the Collision and proceeded to complete immediate provisional repairs to secure against breaches, pump out water, remove and clean flooded equipment, ensure that no ammonia was leaking from the fish wells, and check the double bottoms for fuel or oil leakage.

42. Crew from the nearby *Sandra C* came aboard to assist the *Koorale* in some of these efforts.

43. A brief radio exchange between the *Koorale* and *American Eagle* revealed that the *American Eagle* may have sustained a hole in her bulbous bow where she struck the *Koorale* but was otherwise stable. The *American Eagle* did not provide assistance to the *Koorale* or have any further communication with the *Koorale*.

44. On information and belief, the *American Eagle*'s conduct resulting in the Collision was carried out with intent to damage the *Koorale* and/or to intimidate the *Koorale* off of the fish she was tracking and over which she had priority per the Group Code.

45. Because the *American Eagle*, on information and belief, could clearly see the *Koorale*'s position at all relevant times, her act of continuing to sail directly at the *Koorale*'s port side at full or near full speed without taking any apparent evasive action was carried out recklessly, wantonly, and with callous disregard of the safety of the *Koorale* and her crew.

46. On information and belief, the *American Eagle* has on previous and subsequent occasion or occasions engaged in conduct similar to that which caused the Collision, including similar conduct towards the *Koorale*, putting the *American Eagle*'s owner(s), manager(s), operator(s), and navigator(s), including AE Fishing and Tradition Mariner, on notice of her propensity for such conduct.

47. Within about 24 hours after the Collision, the *Koorale* had completed necessary provisional repairs, and the *Koorale* returned to the nearest logical port of refuge, Pago Pago Harbor, on June 24, 2019, where she discharged approximately 400 metric tons of tuna at the Starkist Samoa cannery.

48. The USCG conducted an investigation of the Collision when the *Koorale* arrived in port, including inspection of the vessel and navigational equipment and interviews of *Koorale* crew members.

49. On information and belief, a similar inspection and interviews were conducted of the *American Eagle* and her crew when the *American Eagle* returned to Pago Pago Harbor shortly thereafter.

50. After further necessary repairs were made to the *Koorale* in Pago Pago Harbor, she sailed to Port Nelson, New Zealand, to further assess the damage and complete permanent repairs, which remain underway.

51. M & F Fishing chose to complete repairs in Port Nelson, New Zealand because it was the closest port with shipyards familiar with tuna seiners and capable of performing the necessary work. Yards in the U.S., along with Mexico, Panama, PNG, and Singapore, were also considered but ruled out for various reasons—primarily distance and expense.

52. On information and belief, the *American Eagle* departed Pago Pago Harbor soon after the *Koorale* to resume fishing and has continued actively and successfully fishing since the Collision.

53. On information and belief, AE Fishing and Tradition Mariner have directed and/or allowed the *American Eagle* to continue fishing since the Collision under the command of the same Master, Sergio Gonzalez, who was in command of the *American Eagle* at the time of the Collision. On information and belief, the same Master was in command of the vessel on prior occasion or occasions when the *American Eagle* engaged in conduct similar to that which caused the Collision.

54. Likewise, on information and belief, AE Fishing and Tradition Mariner have directed and/or allowed the *American Eagle* to continue fishing since the Collision under the management and supervision of the same individual fleet manager, Larry da Rosa, overseeing the *American Eagle*'s fishing operations at the time of the Collision. On information and belief, the same fleet manager was overseeing the fishing operations of the vessel on prior

occasion or occasions when the *American Eagle* engaged in conduct similar to that which caused the Collision.

55. As a result of the Collision and resulting damage to the *Koorale*, M & F Fishing, Inc. has or will sustain repair and repair-related losses of at or around $10,000,000, including but not limited to: (a) fuel, lubes, and other associated costs for travel to Port Nelson, NZ to undergo Collision repairs; (b) hull and machinery repairs, reconstruction, and replacement costs; (c) agency fees, crew wages, repatriation costs, owner's representation, accommodations, transport, etc., during repairs; (d) berthing, electricity, water, port movements, slipping, etc., during repairs; (e) surveyor fees, naval architect fees, and other labor costs related to repairs; and (f) other repair-related costs.

56. As an additional result of the Collision and resulting damage to the *Koorale*, M & F Fishing will further sustain consequential losses of at our around $10,500,000, including but not limited to: (a) lost fishing gear, including approximately 600 fish aggregating devices ("**FADs**") that were placed by the *Koorale* over many years in various waters but are now unrecoverable; (b) lost fishing licensure purchased prior to the Collision but unable to be used by the *Koorale* due to the Collision; (c) lost fishing profits for an estimated 14 months out of production during repairs and at least six months at marginal production following repairs; (d) cost of additional fuel, lube, and other costs necessary to replace FADs following repairs; (e) cost of additional fuel, lube, and other costs necessary to travel to U.S. shipyards for future structural repairs;[1] (e) increased insurance premiums during repairs; (f) layup damages; (g) insurance deductibles; and (h) other consequential damages.

---

[1] The *Koorale* holds a U.S. Fishery endorsement under the Jones Act (the "**Endorsement**"), a rare distinction that has been vital to the *Koorale*'s profitability in an increasingly difficult industry. To maintain the Endorsement, foreign structural repairs to the *Koorale* must stay within a 7.5 percent steelweight threshold regulated by the U.S. Coast Guard. Although it is anticipated that Collision-related repairs in Port Nelson, NZ can be completed within this

57. M & F Fishing now seeks recovery of these and other damages, based on the following causes of action.

## IV. FIRST CAUSE OF ACTION

### *Negligence/Breach of Navigation Rules against AE Fishing*

58. M & F Fishing repeats and realleges each of the allegations contained in all of the preceding paragraphs 1 through 57, inclusive, as if fully set forth at length herein.

59. At the time of the Collision, the *American Eagle*, her Master, and her crew were under a duty to adhere to the Navigation Rules and to otherwise exercise reasonable prudence in the operation and navigation of the vessel.

60. By engaging in the conduct alleged herein, the *American Eagle*, her Master, and her crew violated multiple of the Navigation Rules, including but not limited to: (a) failing to place proper lookout(s) in violation of Navigation Rule 5; (b) failing to travel at safe speed in violation of Navigation Rule 6; (c) failing to use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists, in violation of Navigation Rule 7; and (d) failing to take appropriate action to avoid collision as the give way vessel in a crossing situation and/or to give way to a vessel engaged in fishing, in violation of Navigation Rules 8, 15, 16, and 18.

61. Likewise, the *American Eagle*, her Master, and her crew otherwise failed to act with reasonable prudence by failing to adhere to generally accepted standards, customs, and

---

threshold such that the Endorsement can be maintained, much of the *Koorale*'s allowable foreign structural work will be depleted in the project, effectively eliminating the *Koorale*'s ability to perform further structural repairs in a foreign shipyard. This will result in additional fuel, lube, and other costs given that the American Samoa shipyard is currently defunct and other U.S. options are limited and distant.

practices of the industry and the Group Code, including but not limited to failing to allow the closest vessel to a school of fish priority to attempt a set.

62. The *American Eagle*'s violations of the Navigation Rules and generally accepted standards, customs, and practices of the industry and the Code Group were the sole and proximate cause of the Collision and the damage suffered by the *Koorale* and M & F Fishing, as further alleged herein.

63. Each of the Navigation Rules is a regulation that imposes a mandatory duty involving maritime safety and navigation, and the injury suffered by the *Koorale* and M & F Fishing is of the nature that the Navigation Rules were meant to protect against, creating a presumption that the *American Eagle*'s conduct was the proximate cause of the alleged harm to M & F Fishing.

64. On information and belief, the *American Eagle* is owned, managed, operated, navigated, and/or controlled by AE Fishing, such that AE Fishing is vicariously liable for the *American Eagle*'s negligent breaches of the Navigation Rules and industry standards, customs, and practices, which breaches were the sole proximate cause of the Collision and the damages alleged herein.

65. On information and belief, AE Fishing was on notice of the *American Eagle*'s, her Master's, and her crew's proclivity for engaging in conduct of the type that caused the Collision, due to it actual and/or constructive knowledge of the *American Eagle*'s commission of similar conduct on prior occasion or occasions, while under the command and supervision of the same Master and fleet manager.

66. Yet, AE Fishing allowed the *American Eagle* to continue fishing with the same Master and crew (and even continued to do so following the Collision), in breach of its duty to supply an adequate and competent crew and to exercise reasonable diligence to ensure that the Master operates the vessel according to instructions.

67. Accordingly, AE Fishing was in privity with the *American Eagle* in negligently and proximately causing the harm to M & F Fishing as alleged herein, such that it is not entitled to limit its liability as provided under the U.S. Limitation of Liability Act or any other applicable law and is instead jointly and severally liable with all defendants for the full extent of M & F Fishing's harm as alleged herein.

68. On information and belief, the *American Eagle*'s conduct resulting in the Collision was carried out with intent to damage the *Koorale* and/or to forcibly intimidate the *Koorale* away from: (a) the fish over which she had priority per the Group Code; and (b) the course she was entitled to keep per the Navigation Rules.

69. Because the *American Eagle*, on information and belief, could clearly see the *Koorale*'s position at all relevant times, her act of continuing to sail directly at the *Koorale* at full or near full speed without taking any apparent evasive action constitutes reckless, wanton conduct in callous disregard for the safety of others.

70. On information and belief, the *American Eagle* has on previous occasion or occasions—while under the command and supervision of the same Master and fleet manager—engaged in conduct similar to that which caused the Collision, including similar conduct towards the *Koorale*, putting AE Fishing on actual and/or constructive notice of her and her crew's propensity for such bad faith conduct.

71. Yet, AE Fishing allowed the *American Eagle* to persist in such conduct, putting it in privity with the *American Eagle* and making Defendants jointly and severally liable to M & F Fishing for punitive damages in accord with federal case law.

### V. SECOND CAUSE OF ACTION

*Negligence/Breach of Navigation Rules against Tradition Mariner*

72. M & F Fishing repeats and realleges each of the allegations contained in all of the preceding paragraphs 1 through 71, inclusive, as if fully set forth at length herein.

73. At the time of the Collision, the *American Eagle*, her Master, and her crew were under a duty to adhere to the Navigation Rules and to otherwise exercise reasonable prudence in the operation and navigation of the vessel.

74. By engaging in the conduct alleged herein, the *American Eagle*, her Master, and her crew violated multiple of the Navigation Rules, including but not limited to: (a) failing to place proper lookout(s) in violation of Navigation Rule 5; (b) failing to travel at safe speed in violation of Navigation Rule 6; (c) failing to use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists, in violation of Navigation Rule 7; and (d) failing to take appropriate action to avoid collision as the give way vessel in a crossing situation and/or to give way to a vessel engaged in fishing, in violation of Navigation Rules 8, 15, 16, and 18.

75. Likewise, the *American Eagle*, her Master, and her crew otherwise failed to act with reasonable prudence by failing to adhere to generally accepted standards, customs, and practices of the industry and the Group Code, including but not limited to failing to allow the closest vessel to a school of fish priority to attempt a set.

76. The *American Eagle*'s violations of the Navigation Rules and generally accepted standards, customs, and practices of the industry and the Code Group were the sole and proximate cause of the Collision and the damage suffered by the *Koorale* and M & F Fishing, as further alleged herein.

77. Each of the Navigation Rules is a regulation that imposes a mandatory duty involving maritime safety and navigation, and the injury suffered by the *Koorale* and M & F Fishing is of the nature that the Navigation Rules were meant to protect against, creating a presumption that the *American Eagle*'s conduct was the proximate cause of the alleged harm to M & F Fishing.

78. On information and belief, the *American Eagle* is owned, managed, operated, navigated, and/or controlled by Tradition Mariner, such that Tradition Mariner is vicariously liable for the *American Eagle*'s negligent breaches of the Navigation Rules and industry standards, customs, and practices, which breaches were the sole proximate cause of the Collision and the damages alleged herein.

79. On information and belief, Tradition Mariner was on notice of the *American Eagle*'s, her Master's, and her crew's proclivity for engaging in conduct of the type that caused the Collision, due to its actual and/or constructive knowledge of the *American Eagle*'s commission of similar conduct on prior occasion or occasions, while under the command and supervision of the same Master and fleet manager.

80. Yet, Tradition Mariner allowed the *American Eagle* to continue fishing with the same Master and crew (and even continued to do so following the Collision), in breach of its duty to supply an adequate and competent crew and to exercise reasonable diligence to ensure that the Master operates the vessel according to instructions.

81. Accordingly, Tradition Mariner was in privity with the *American Eagle* in negligently and proximately causing the harm to M & F Fishing as alleged herein, such that it is not entitled to limit its liability as provided under the U.S. Limitation of Liability Act or any other applicable law and is instead jointly and severally liable with all defendants for the full extent of M & F Fishing's harm as alleged herein.

82. On information and belief, the *American Eagle*'s conduct resulting in the Collision was carried out with intent to damage the *Koorale* and/or to forcibly intimidate the *Koorale* away from: (a) the fish over which she had priority per the Group Code; and (b) the course she was entitled to keep per the Navigation Rules.

83. Because the *American Eagle*, on information and belief, could clearly see the *Koorale*'s position at all relevant times, her act of continuing to sail directly at the *Koorale* at

full or near full speed without taking any apparent evasive action constitutes reckless, wanton conduct in callous disregard for the safety of others.

84. On information and belief, the *American Eagle* has on previous occasion or occasions—while under the command and supervision of the same Master and fleet manager—engaged in conduct similar to that which caused the Collision, including similar conduct towards the *Koorale*, putting Tradition Mariner on actual and/or constructive notice of her and her crew's propensity for such bad faith conduct.

85. Yet, Tradition Mariner allowed the *American Eagle* to persist in such conduct, putting it in privity with the *American Eagle* and making Defendants jointly and severally liable to M & F Fishing for punitive damages in accord with federal case law.

WHEREFORE, M & F Fishing prays for judgment as follows:

A. That AE Fishing and Tradition Mariner be cited to appear and answer this Complaint;

B. That M & F Fishing have a judgment for damages, jointly and severally against AE Fishing and Tradition Mariner, in excess of $20,500,000.00;

C. That M & F Fishing have a judgment for punitive relief in an amount consistent with federal case law;

D. That M & F Fishing be awarded fees and costs of suit;

E. That M & F Fishing be awarded prejudgment interest on the amounts awarded;

F. That M & F Fishing be awarded such other and further relief as this Court deems just and proper.

Dated February 7, 2020

/s/   Eric C. Thiel
Eric C. Thiel, Esq. (FBN 0016267)
BANKER LOPEZ GASSLER P.A.
501 E. Kennedy Blvd., Ste. 1700
Tampa, FL 33602
t: 813.221.1500
f: 813.222.3066
service-ethiel@bankerlopez.com

Daniel E. Mooney*
MOONEY WIELAND PLLC
802 W. Bannock St., Ste. 500
Boise, Idaho 83702
t: 208.401.9219
f: 208.401.9218
daniel.mooney@mooneywieland.com
*Pro Hac Vice admission to be sought

Counsel for Plaintiff M & F Fishing, Inc.